Estate of Frank Bloise, Deceased, Nicholas Bloise, Executor, Aida B. Gabriele, Executrix v. Commissioner.
Estate of Bloise v. Commissioner
Docket No. 4612-62.
United States Tax Court
T.C. Memo 1966-44; 1966 Tax Ct. Memo LEXIS 238; 25 T.C.M. (CCH) 251; T.C.M. (RIA) 66044; February 28, 1966
*238 Held, that since the petitioner failed to show that the decedent held stock under a parol trust for the benefit of his brothers and sisters, the fair market value of such stock is includable in the decedent's gross estate under either section 2033 or section 2035 of the Internal Revenue Code of 1954. Held, further, that the respondent did not err in disallowing a portion of the amount claimed by the estate as a deduction on account of the decedent's debt to a corporation. George D. Kline 35 Fern Hill Rd., West Chester, Pa., for the petitioner. Albert Squire, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in estate tax in the amount of $69,231.17. The issues are (1) whether the respondent erred in including in the gross estate of the decedent 5,794 1/4 shares of stock of a corporation, claimed by the petitioner to have been owned by the brothers and sisters of the decedent and (2) whether the respondent erred in determining that the petitioner is entitled to a deduction in computing the net estate of $20,000 on account of a debt owing by the decedent to such corporation at the time of his death, rather than *239 $30,226.18 as claimed by the petitioner. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Frank Bloise, sometimes hereinafter referred to as the decedent, was born in 1900 and died testate in Chester County, Pennsylvania, on September 9, 1958. He was survived by his wife, Adeline Bloise, 4 brothers, Louis (born in 1902), John (born about 1904), Nicholas (born in 1905), Salvatore (born about 1909), and 3 sisters, Rose Carrubba (born about 1913 or 1914), Aida Gabriele (born about 1915 or 1916), and Pierina Vitale (born about 1917 or 1918). The Federal estate tax return of the decedent was filed with the district director of internal revenue, Philadelphia, Pennsylvania, on April 10, 1959. Paschal Bloise was the father of the decedent and his brothers and sisters named above. He had, since 1920, been engaged in the men's clothing industry in New York City, operating 3 enterprises known as P. Bloise, Inc., Dewey Clothing, Inc., and N. Bloise and Company. In 1940 or 1941 these enterprises were liquidated. Nicholas Bloise moved to Philadelphia about 1940. Paschal moved from New York City to Chester County, Pennsylvania, in 1941 or 1942. *240 The rest of Paschal's children moved to Chester County between 1940 and 1945. On May 1, 1945, a corporation known as Langoma Industries, Inc. (hereinafter referred to as Langoma), was organized under the laws of the state of Pennsylvania with authorized capitalization of 7,500 shares of common stock with a par value of $100 per share, of which 2,922 shares were issued at its inception. Its original stockholders were Frank Bloise, who held 1,790 shares; Nicholas Bloise, who held 6 shares; Henry I. Silverman, who held 1,120 shares; and Clara Silverman, who held 6 shares. The decedent became president of Langoma and his brothers and sisters were employed by the corporation. The decedent continued to be president of the corporation until his death. At its inception and throughout at least the taxable years ended March 31, 1946, 1947, and 1948 Langoma was engaged in the business of farming and/or timber cutting. During its taxable years ended March 31, 1954 through 1959, Langoma's principal activity was the manufacture of men's clothing. Paschal Bloise did not file any Federal gift tax returns during the period 1940 until the time of his death on February 2, 1953. He left no will and there *241 were no court proceedings in intestacy with respect to his estate. No Federal estate tax return or Pennsylvania inheritance tax return was filed on behalf of his estate. The remainder of the authorized capital stock of Langoma was issued between December 31, 1946 and August 22, 1947, with the result that for a number of years thereafter the stock of Langoma was held as follows: Certifi-
Number
cate
of
Date
Number
Shares
of Issue
Registered Holder
1
1,790
5/ 1/45
Frank Bloise
2
1,120
5/ 1/45
Henry I. Silverman
3
6
5/ 1/45
Nicholas Bloise
4
6
5/ 1/45
Clara Silverman
5
100
12/31/46
Silvia Hirshinson
6
50
12/31/46
Alice D. Adest
7
250
12/31/46
Nathan Noble
8
225
12/31/46
Sam Sherman
9
225
12/31/46
Harry Bryer
10
250
12/31/46
Ruth B. Young
11
50
12/31/46
Lee Silverman
12
600
12/31/46
Henry I. Silverman
13
210
12/31/46
Frank Bloise
14
100
12/31/46
Max Broitman
15
170
12/31/46
Louis Israel
16
25
1/23/47
Sam Sherman
17
25
1/23/47
Harry Bryer
18
50
1/23/47
Max Broitman
19
100
4/ 1/47
Max Broitman
20
200
5/ 2/47
David Fishman
21
400
5/29/47
Frank Bloise
22
330
5/29/47
Henry I. Silverman
23
140
5/29/47
Frank Bloise
24
50
7/15/47
Ruth B. Young
25
50
7/15/47
Harry Bryer
26
50
7/15/47
Max Broitman
27
50
7/15/47
Nathan Noble
28
878
8/22/47
Samuel H. Weiner
Total
7,500 Between June 1953 and March 1956, the registered *242 holders of stock certificates representing 1,356 shares of stock of Langoma transferred their certificates to the decedent, endorsing the certificates to the decedent. This included the transfer, on September 3, 1955, by Nicholas Bloise to the decedent of his certificate for 6 shares of stock. The decedent held these certificates until April 2, 1956, at which time he surrendered them, together with the certificates for 2,540 shares which had been issued to him, to the corporation for cancellation, receiving from the corporation in replacement thereof 8 certificates (numbered 34 through 41), each naming him as the registered holder of 487 shares of stock, or a total of 3,896 shares. Between April 2, 1956 and July 29, 1958, there were purchased in the name of the decedent the remaining 3,604 shares of outstanding stock owned by other stockholders. With two exceptions, [1] the sellers of all of the shares so purchased after April 2, 1956, endorsed their certificates in blank, did not date their endorsements, and delivered the certificates to the decedent. The decedent did not surrender the stock certificates so purchased after April 2, 1956 to Langoma for new certificates, and no entries *243 were made in Langoma's stock transfer book to reflect any transfers of stock made after September 3, 1955. [2]
The decedent had suffered from cancer since 1955. In July 1958 his physician found that the cancerous condition was present in his lungs and abdomen, and concluded that this cancerous condition was irreversible and was bound to lead to his death. The physician did not expect him to live out the year. During 1958 the decedent was treated with several medications, including a drug to reduce his fever. The drug tended to give him *244 a feeling of euphoria, but effected no change in him pathologically. The decedent was hospitalized several times during 1958. He was discharged from the hospital on July 25, 1958. During that year when he was unable to attend to business at the company plant his brothers acted for him and held meetings in his home. On July 29, 1958, a meeting was held in the decedent's home attended by himself; his wife, Adeline; his brothers, Nicholas and John; the attorney for Langoma, Louis Epstein; a local attorney, Glen Harman; a bank president; a notary public; and two witnesses. At that time an agreement between the decedent and his brothers and sisters (collectively called first party) and the decedent's wife, Adeline (called second party), was signed by the decedent, his brothers Nicholas and John, and his wife, Adeline (the others signing subsequently). Such agreement had been prepared in the office of Harman, and provided in part as follows: WHEREAS, the Bloise family, through succession, inheritance, purchase, assignment and conveyances, etc., are the equitable and/or legal owners of the Capital Stock of Langoma Industries, Inc. , a Pennsylvania Corporation; and other properties; and WHEREAS, *245 the parties hereto wish to establish, determine and spell-out the relative and proportionate shares, interests, estates, rights and portions which the parties hereto are and shall be entitled to; and WHEREAS, the shares of stock of said Langoma Industries, Inc., are registered in the name of Frank Bloise, or have been assigned to him through numerous assignments, issues and transfers; and WHEREAS, the parties hereto wish to spell-out and determine absolutely their rights and interests in and to the properties and assets registered in the name of Frank Bloise, by agreement legally binding upon all concerned, now and in the future, so far as possible; and WHEREAS, the Second Party is the owner and holder of substantial property and assets in her own right; NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants herein made, and in consideration of the sum of one dollar each in hand paid to each of the others, at and before the ensealing and delivery hereof, the receipt whereof is hereby acknowledged, and intending to be legally bound hereby the parties hereto do covenant and agree as follows: 1. The Second Party has been fully advised in the premises and is fully *246 advised and aware of her rights, full disclosure having been made to her of the assets of her husband, Frank Bloise, including the shares of stock held by him in Langoma Industries, Inc., whether by issue, endorsement, sale, transfer or pledge * * *. Second Party, Adeline Bloise, acknowledges that no effort has been made by Frank Bloise to hide or avoid disclosure to her of his financial affairs. 2. The Second Party hereby recognizes the rights and interests of the First Party, the Bloise Family, in and to Langoma Industries, Inc., as well as other property and assets registered in the name of said Frank Bloise, it being the Second Party's wish and desire that such be determined, distributed and disposed of as herein set forth, and not otherwise. 3. Upon the decease of said Frank Bloise, husband of Adeline Bloise, the entire estate of said Frank Bloise shall be divided into eight (8) equal shares or parts, and shall be distributed and divided among the Second Party, Adeline Bloise, and Louis Bloise, John Bloise, Salvatore Bloise, Nicholas Bloise, Rose B. Carrubba, Aida B. Gabriele, Pierina B. Vitale, in equal shares, share and share alike, except as hereinafter set forth. 4 and 5 [Set *247 forth certain exceptions relating to decedent's personal residence and furnishings, and an automobile.] * * * 7. It is further agreed that this agreement constitutes a fully and complete property settlement agreement between the parties hereto in and to the property and assets registered in the name of said Frank Bloise, and that this agreement and the terms hereof shall be construed as a post-nuptial agreement between Frank Bloise and Adeline Bloise, his wife, and as a property settlement agreement between Adeline Bloise, Frank Bloise and the brothers and sisters of said Frank Bloise, all believing such to be most equitable and legally proper because of and as a result of the close family relationship involved, and all recognizing the fact that the present estate of Frank Bloise consists, among other things, of assets and property derived by him from his father, Pasquale Bloise, and his uncle, Louis Bloise, and held by said Frank Bloise for the benefit of his brothers and sisters. 8. The provisions made herein for the benefit of Adeline Bloise, wife of Frank Bloise, are in lieu of any dower or intestate share rights she has, may have, or would have had, in and to the estate of her *248 said husband, Frank Bloise, and she does hereby renounce and waive any and all rights she has or may have to elect to take under or against any will of Frank Bloise, if he should be deceased, testate, and fully and absolutely agrees with her husband, Frank Bloise, and his brothers and sisters that the entire estate of Frank Bloise shall and will be divided into eight (8) equal shares, of which each one of the parties hereto, except Frank Bloise, shall receive one share each, except as herein otherwise provided, anything in any will Frank Bloise may leave to the contrary notwithstanding. 9. Second Party, Adeline Bloise, further acknowledges that she has substantial and adequate property and assets of her own, and further agrees that the provision made for her one-eighth share is fair, proper and adequate for her future care and maintenance after Frank Bloise's decease, and is in lieu of any dower or intestate share rights she has or may have to the estate of her husband, Frank Bloise. 10. The parties hereto fully agree that this agreement shall run to, bind and benefit the heirs, executors, administrators, and assigns of the parties hereto, and that this agreement shall and may be *249 recorded as such, and that upon delivery to each of the said Adeline Bloise, Second Party, and the seven brothers and sisters of Frank Bloise, after his decease, of his or her one-eighth share of said estate, that such party shall immediately execute a good and sufficient release of any further right or claim in and to said estate. At such meeting on July 29, 1958, the decedent endorsed over to his wife and his brothers and sisters, as joint assignees, the 8 stock certificates which had been issued to him on April 2, 1956, each in the amount of 487 shares of Langoma stock, an aggregate of 3,896 shares. He also assigned over to the same parties jointly the 2 stock certificates which had been transferred to him on October 10, 1956, representing in the aggregate 200 shares of stock. At such meeting the undated certificates which had been endorsed in blank and delivered to the decedent between April 2, 1956 and July 29, 1958, aggregating 2,526 shares, were dated July 29, 1958, and there were named thereon, as joint assignees, the decedent's wife and his brothers and sisters. At such meeting all the above certificates, representing 6,622 shares of stock, were canceled and there was issued *250 by Langoma (the decedent signing as president) to the decedent's wife and his brothers and sisters, jointly, a new certificate, numbered 44, in the amount of 6,622 shares. On the same date such certificate for 6,622 shares was then canceled and 8 new certificates, each in the amount of 827 3/4 shares, were then issued, one in the name of the decedent's wife and one in the name of each of the decedent's brothers and sisters. The attorney Epstein took these 8 new certificates to his office in New York for the purpose of attaching revenue stamps thereto. He thereafter sent them to Langoma's accounting firm for recording. At an undisclosed time thereafter each of the individuals received his stock certificate from the accounting firm, Nicholas receiving his within 2 weeks after July 29, 1958. At the meeting on July 29, 1958, the decedent also assigned to his wife and his brothers and sisters, jointly, the certificate for 878 shares of Langoma stock which the decedent had purchased from the estate of Samuel H. Weiner, the purchase price of which had not been completed at the date of the decedent's death. Neither the decedent's wife nor his brothers and sisters paid the decedent any consideration *251 in connection with the stock transactions which occurred on July 29, 1958. On July 29, 1958, the decedent executed a will (which was probated after his death on September 9, 1958) which, after providing for the payment of debts and funeral expenses, provided in part as follows: THIRD: All the rest, residue and remainder of my estate, whether real, personal or mixed, of whatsoever nature, kind or description, and wheresoever situate, I give, devise and bequeath unto my beloved wife, ADELINE BLOISE, LOUIS BLOISE, my brother, JOHN BLOISE, my brother, SALVATORE BLOISE, my brother, NICHOLAS BLOISE, my brother, ROSE B. CARRUBBA, my sister, AIDA B. GABRIELE, my sister, and PIERINA B. VITALE, my sister, in equal one-eighth shares each, share and share alike, or to their issue per stirpes. The provision hereinabove made for my beloved wife, ADELINE BLOISE, is in lieu of any dower or intestate share rights she has or may have in and to my estate, in accordance with a certain property settlement agreement dated July 29, 1958, by and between myself, my wife, Adeline Bloise, and my brothers and sisters hereinabove named, which said agreement is incorporated herein and made a part hereof by reference *252 thereto. * * *
SIXTH: * * * (d) I further direct my said Executors to fully carry out all of the terms, covenants and conditions of the property settlement agreement dated July 29, 1958, by and between myself, my wife, Adeline Bloise, and my brothers and sisters hereinabove named, which said agreement is incorporated herein by reference. At no time did the decedent prepare or sign any declaration of trust in favor of his brothers and sisters with respect to the stock which he held in Langoma. In April or May 1952 the decedent, prior to a trip to Boston, executed a promissory note in the amount of $200,000 in favor of his four brothers. Such note was never paid. Sometime in April or May 1955 or 1956, when the decedent and his wife were discussing another legal matter with an attorney, the decedent incidentally stated to the attorney that he intended to come to see him again about transferring to his brothers and sisters seven-eighths of the stock of Langoma which he held in his name. At that time he told the attorney that while he was holding the stock in his name, seven-eighths thereof was being held for and on behalf of his brothers and sisters. In 1958 Langoma manufactured, among *253 other clothing, uniforms for the military service. On June 19, 1958, the decedent, as president of Langoma, executed a document entitled "Affidavit of Bidder/Offeror/Proposed Sub-Contractor," which was submitted on August 29, 1958, to the Defense Clothing Textile and Supply Center, a Federal government agency, in connection with a bid for a contract to supply military uniforms, and which provides in part: I solemnly swear that the following is correct to the best of my knowledge and belief: a. The firm of Langoma Industries, Incorporated is (1) A corporation organized and existing under the laws of the State of Pennsylvania. The officers and directors are: Frank Bloise, President. Adeline Bloise, Secretary. Salvatore Bloise, Treasurer. Directors: Frank Bloise, Adeline Bloise, John Bloise, Louis Bloise, Salvatore Bloise. * * *
c. Corporate firm: (1) Number of authorized and outstanding shares of stock of each class: 7500. (2) List of all stockholders and number of shares of each class held: Frank Bloise. (3) If any stockholder listed above holds said stock for the beneficial interest, or subject to the control, of another individual or firm, name the firm or individual beneficially *254 interested or having such control: None. (4) Names of individuals or firms to whom affiant's principals have pledged the firm's stock as collateral security for obligations: None. (5) Holders of rights to vote corporation stock if other than as stipulated under c(2) above: None. The form containing the above statements stated that the purpose of the affidavit was to enable the Government to determine the ownership of, and significant interests in, firms submitting bids or quotations on military procurements, and called attention to section 1001 of Title 18 of the United States Code, which provides for a fine or imprisonment or both for making any false or fictitious statements or any misrepresentations in any matter within the jurisdiction of any department or agency of the United States. On July 22, 1958, Nicholas Bloise, as manager of Langoma, executed a document entitled "Qualification Questionnarire for Placement on Qualified Manufacturers' List," which was submitted to the Military Clothing and Textile Supply Agency, a Federal Government agency. Therein Nicholas Bloise certified that the decedent owned all the 7,500 outstanding shares of stock of Langoma; that the decedent did *255 not hold any of such shares for the beneficial interest, or subject to the control, of any other individual; and that no one other than the decedent held the right to vote the corporate stock. This form also contained similar statements with regard to the purpose of the submission of the form and called attention to section 1001 of Title 18 of the United States Code. Prior to the death of the decedent, his brothers and sisters and wife did not exercise any voting rights with respect to the stock of Langoma. No stockholders' meetings were held between July 29, 1958 and September 9, 1958. On December 16, 1958, the decedent's widow filed an election to take under the decedent's will. On July 21, 1959, she filed an election to take against the will. On July 5, 1963, the Orphans' Court of Chester County, Pennsylvania, decided that she had not justified the revocation of her previous election. She did not appeal this decision. On June 19, 1964, the executors of the decedent's estate filed an inheritance tax return with the state of Pennsylvania in which they reported that the estate contained assets including, inter alia, 937 1/2 shares of common stock of Langoma Industries, Inc., with a *256 total fair market value at the date of the decedent's death of $28,125 (or $30 per share). On January 30, 1964, the decedent's wife filed an inheritance tax return with the state of Pennsylvania for the estate of her deceased husband in which she reported that the assets of the estate included 7,500 shares of common stock of the company. Langoma was liquidated in 1962. In their Federal income tax return for the taxable year 1962 Nicholas Bloise and his wife reported long-term capital gain of $46,375 from the surrender of their 937 1/2 shares of stock of Langoma, representing that the stock had been acquired in 1958 and that its basis was $28,125 (which is $30 per share). In the balance sheet attached to Langoma's Federal income tax return for the taxable year ended March 31, 1959, it is shown that the corporation had notes and accounts receivable at the beginning of the year of $659.29 and at the end of the year of $50,477.52. The balance sheet attached to the corporate return for the taxable year ended March 31, 1960, showed that at the end of the year there were notes and accounts receivable of $471.90. Balance sheets attached to the corporate returns for the taxable years ended *257 March 31, 1961 and 1962 show no notes and accounts receivable. The balance sheet forms attached to the returns for the latter two years contain an asset category "Loans to stockholders," but no amounts were listed in such category. Langoma filed its final return for a short period ended May 31, 1962, and the attached balance sheet showed no assets or liabilities and was marked "Liquidated." Another balance sheet, separately admitted in evidence, purporting to show the assets and liabilities of Langoma as of May 31, 1962, contains as an item of current assets a loan receivable from Frank Bloise in the amount of $30,346.18. This balance sheet and the above corporate returns were prepared for Langoma by the same accounting firm. In the decedent's Federal estate tax return which was filed on April 10, 1959, there were included among assets of the estate 1,705 3/4 shares of common stock of Langoma, of which 878 shares were shown as being held in escrow by the "Estate of Samuel H. Weiner, as security for balance of purchase price. " Such stock was included therein at a value of $30 per share. In such return there was listed a debt of $13,170 described as "Samuel H. Weiner Estate - Stock." *258 Also listed as a debt of the decedent was an amount of $30,226.18 described as "Langoma Industries Inc. - Loans." The return showed a gross estate of $113,785.90, deductions totaling $85,184.08, a specific exemption of $60,000, and no estate tax due. In determining the deficiency in Federal estate tax, the respondent included in the gross estate, at a fair market value of $51 per share, all the outstanding stock of Langoma, stating that the stock was included under section 2033 or section 2035 of the Internal Revenue Code of 1954. The respondent also disallowed $10,226.18 of the amount of $30,226.18 claimed by the estate as a debt owed by the decedent to Langoma, with the explanation "Item corrected to date of death." Opinion The petitioner contends that 5,794 1/4 shares of the stock of Langoma, which the respondent included in the decedent's gross estate, in reality were owned by the decedent's brothers and sisters. It is its contention that the decedent had held such shares as trustee for the benefit of his brothers and sisters, that he transferred legal title to such stock to them on July 29, 1958, in discharge of such trust, and that therefore the respondent erred in including *259 such stock in the gross estate. There was no written trust agreement with respect to such stock, but it is the contention of the petitioner that the decedent held the stock in question under an oral trust for the benefit of his brothers and sisters. It is well settled that in the application of a Federal revenue act state law controls in determining the ownership of property. Morgan v. Commissioner, 309 U.S. 78, and Aquilino v. Commissioner, 363 U.S. 509. The transactions concerning the alleged parol trust took place in Pennsylvania, but one asserting such a trust must establish its existence by "clear, precise and unequivocal" or "clear, precise and indubitable" evidence. Van Sciver v. Rothensies, 36 F. Supp. 577, affd. (C.A. 3) 122 F. 2d 697, and Pennsylvania cases cited therein. In support of its contention that prior to July 29, 1958, the decedent held the Langoma stock in question in trust for his brothers and sisters, the petitioner relies upon, among other things, the agreement of July 29, 1958, between the decedent and his brothers and sisters on the one hand and the decedent's wife on the other, which recited, in effect, that although the stock of Langoma was registered *260 in the name of the decedent, the Bloise family were the equitable or legal owners thereof through succession, inheritance, purchase, assignment and conveyances, etc. It also relies upon the fact that in 1955 or 1956 the decedent had stated to an attorney that seven-eighths of the stock of Langoma which he held in his own name was being held for and on behalf of his brothers and sisters; the fact that in 1952 the decedent had executed a note for $200,000 in favor of his 4 brothers; the fact that on April 2, 1956, the decedent caused the corporation to issue to him 8 certificates, representing all the stock which he then held in Langoma; and the fact that on July 29, 1958, he endorsed those certificates and executed assignments of other certificates to his brothers and sisters and his wife jointly. It also relies heavily upon the testimony of Nicholas Bloise, brother of the decedent and one of the executors of the estate. Nicholas Bloise testified that the money used by the decedent to acquire in his own name 1,790 shares of Langoma stock upon its organization in 1945 came from proceeds from the liquidation, in 1950 or 1941, of the New York clothing businesses conducted by his father, *261 Paschal Bloise; that such funds had been received by the decedent from his father between 1941 and 1942; that when Langoma was formed Pascal Bloise wanted the business to be held by the family because it provided them "a living"; that there was an understanding among his father, himself, and his 7 brothers and sisters, that the decedent, who was the eldest of the children and who was very competent, should hold the Langoma stock in trust for himself and his brothers and sisters; that when the decedent made subsequent purchases of stock of Langoma (such purchases being in excess of 4,400 shares) the other brothers and sisters contributed to the purchase price; that the note for $200,000 which was executed by the decedent in 1952 in favor of his 4 brothers was evidence of the agreement and was given to protect the interests of the brothers and sisters in Langoma; that although the sisters were not made payees of the note, it was understood that the brothers would "take care of" the sisters if the note was paid; that the note was never paid "because we came to an agreement"; and that the decedent told the accountant for the corporation (whether in 1956 when the decedent caused 8 certificates *262 to be issued in his own name, or in 1958 when he endorsed or assigned all his certificates to his wife and brothers and sisters jointly, is not clear from the record) that he was dividing the stock into 8 equal parts in order to give his brothers and sisters their shares as rightful owners. The testimony of Nicholas Bloise was vague and general in nature. He did not testify as to any details or terms of the alleged oral trust. He stated that he did not know how much money his father had turned over to the decedent and that he did not know of any records which would show the dates and amounts received by the decedent. The evidence does show that no gift tax returns were filed by the father over the period from 1940 until the time of his death in 1953. Nicholas Bloise further stated that he could not testify as to the amount or amounts which were paid by himself or any of his brothers and sisters to the decedent upon any subsequent purchases of stock of Langoma, whether the contributions were equal, or when any such payments were made. None of the other brothers or sisters testified. We must conclude that the evidence presented is not sufficient to establish the existence of a parol *263 trust pursuant to which the decedent held the stock in question for his brothers and sisters. While statements made by the decedent prior to his death, recitations in the agreement of July 29, 1958, the giving of the $200,000 note, and the issuance of stock certificates in the names of his brothers and sisters would be consistent with the existence of such a parol trust, they certainly are not sufficient to establish the existence thereof. These statements and acts would be equally consistent with an intention on the part of the decedent to make either gifts or testamentary dispositions to his brothers and sisters. Indeed, the agreement of July 29, 1958, would appear by its terms to have as its primary purpose the making of a provision for the decedent's wife in lieu of any dower or intestate share rights she might have in his estate. Therein the wife renounced and waived her right to take against any will of the decedent. Such agreement provided that upon the decedent's death his estate should be divided into 8 equal parts and distributed among the decedent's wife and his brothers and sisters. Such agreement was incorporated by reference in the decedent's will which was executed on *264 the same day. Moreover, in 1958 the decedent and Nicholas Bloise each executed and delivered to a Federal Government agency a separate affidavit in which each stated that the decedent was the sole owner of the 7,500 shares of outstanding stock of Langoma and that the decedent did not hold any of such stock for the beneficial interest of any other individual or firm. Nicholas Bloise did not attempt to explain the inconsistency between his testimony and the statement which he had made in his affidavit, nor on brief does the petitioner offer any explanation of either affidavit. The respondent contends that there was no transfer by the decedent of the stock in question to his brothers and sisters prior to his death and that therefore such stock is to be included in the gross estate under section 2033 of the Internal Revenue Code of 1954. [1] In the alternative he contends that if there was a transfer by the decedent prior to his death, such transfer was made without consideration and in contemplation of death, and that therefore the value of the property transferred is to be included in the gross estate under the provisions of section 2035 of the Code. [2] *266 We find it unnecessary to decide *265 whether the decedent owned the stock in question at the time of his death or whether he had transferred it to his brothers and sisters prior to his death. Even if there was a transfer prior to his death, such transfer would have been made within 3 years of the date of the decedent's death and the evidence shows that there was no consideration paid. Section 2035 of the Code provides that such a transfer shall be deemed to have been made in contemplation of death, unless shown to the contrary. The petitioner has adduced no evidence to show that such transfer was not made in contemplation of death. We hold that the value of the stock in question is includable in the gross estate. The parties have stipulated that the fair market value of all the shares includable in the gross estate was, at the date of the decedent's death, $40 per share. The remaining issue is whether, in computing the taxable estate, there should *267 be allowed as a deduction the amount of $30,226.18 claimed as a debt owed to Langoma by the decedent at the time of his death. In the notice of deficiency the respondent allowed only $20,000 of the claimed amount, stating that this item had been corrected to the date of death. The respondent's determination is presumptively correct and the burden of proof is upon the petitioner to show that such determination was erroneous. The petitioner submitted in evidence a balance sheet purporting to show the assets and liabilities of Langoma as of May 31, 1962, which is approximately 3 1/2 years after the decedent's death, which lists as an asset a loan receivable from the decedent in the amount of $30,346.18. On brief the petitioner argues that this balance sheet proves conclusively that at the time of the decedent's death there was due and owing to Langoma the sum of $30,346.18. [3] The respondent, on the other hand, argues that although this balance sheet may indicate the amount owing by the estate of the decedent as of May 31, 1962, it is too remote to establish what amount was owed by the decedent at his death on September 9, 1958. He therefore submits that the evidence does not show that *268 the respondent was in error in determining that as of the date of his death the decedent owed Langoma only $20,000. There is no direct evidence with respect to the decedent's indebtedness to Langoma. The balance sheet attached to Langoma's income tax return for the taxable year ended March 31, 1959 (during which year the decedent died), shows notes and accounts receivable at the beginning of the year of $659.29 and at the end of the year of $50,477.52. The balance sheet attached to its return for the taxable year ended March 31, 1960, shows notes and accounts receivable at the end of the year of $471.90. Balance sheets attached to its returns for the taxable years ended March 31, 1961 and March 31, 1962, show no notes and accounts receivable. The balance sheet forms attached to the returns for the latter two years contain an asset category "Loans to stockholders," but no amounts were listed in such category. The balance sheet forms attached to the returns for the taxable years ended March 31, 1959 and 1960 contain no such category. *269 There is no evidence as to the items making up accounts receivable at the end of the taxable year March 31, 1959, in the amount of $50,477.52. As noted, the balance sheet as of the end of the following year shows notes and accounts receivable in the amount of only $471.90, and the balance sheets as of the end of the next two taxable years show no notes and accounts receivable and no loans to stockholders. There is no explanation whatever of the inconsistency between these balance sheets and the separate balance sheet submitted in evidence purporting to show an amount owing from the decedent to Langoma in the amount of $30,346.18 as of May 31, 1962. The accounting firm which prepared the separate balance sheet as of May 31, 1962, also prepared Langoma's income tax returns for the prior years mentioned. No member of the accounting firm was called as a witness to explain this. Nor was the testimony of Nicholas Bloise enlightening in this respect. [4] Under the circumstances, we cannot accord any probative value to such balance sheet. Nicholas Bloise did not purport to testify of his own knowledge with respect to the amount which the decedent owed Langoma at the date of his death. There *270 is no evidence to show when and in what amount the decedent contracted indebtedness to Langoma, or the amount, if any, which had been discharged prior to his death. Nor, although he was an executor of the estate of the decedent, did Nicholas Bloise testify as to whether, or in what amount, the decedent's liability to Langoma had been paid by the estate. Under the circumstances we must conclude that the respondent did not err in failing to allow the full amount of the deduction claimed on account of the decedent's debt to Langoma. Decision will be entered under Rule 50. Footnotes
1. A certificate for 878 shares, acquired from the estate of Samuel H. Weiner, was undated but endorsed over to and delivered to the decedent. (The purchase price of these 878 shares had not been completed at the time of the decedent's death.) Two other certificates, aggregating 200 shares, were endorsed to the decedent on October 10, 1956, and were delivered to the decedent. ↩
2. This date was stipulated. However, the record shows that one certificate for 100 shares was endorsed over to the decedent on March 14, 1956, and that such certificate was canceled in order to permit the issuance to the decedent on April 2, 1956, of 8 certificates, each for 487 shares.↩
1. SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST. The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of the interest therein of the decedent at the time of his death. ↩
2. Section 2035 of the Internal Revenue Code of 1954 provides: (a) General Rule. - The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
3. It will be noted that this is slightly more than the amount claimed in the estate tax return, but the petitioner makes no claim for an increased deduction.↩
4. His testimony was in part as follows: Q. Were you familiar with the moneys owing by Frank Bloise to Langoma Industries? A. From the record? Q. I show you Petitioner's Exhibit No. 21 and ask you whether or not that is in accordance with what you had in your records of the corporation showing debt due by Frank Bloise? A. $30,346.18. Q. $30,346.18? A. Yes.↩